Filed 7/9/24  In re Andrew C. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re Andrew C., a Person Coming Under the Juvenile Court Law. | B331360, B332687 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No 17CCJP01470B) |
| Plaintiff and Respondent, | |
| v. | |
| V.V., | |
| Defendant and Appellant. | |

CONSOLIDATED APPEALS from an order of the Superior Court of Los Angeles County, Cathy J. Ostiller, Judge.  Affirmed.

Ernesto Paz Rey, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

In consolidated appeals, V.V. (Mother) challenges only the juvenile court's order terminating parental rights to eight-year-old Andrew C. pursuant to Welfare and Institutions Code section 366.26. [1] She contends the juvenile court erred when it found she had not established the beneficial parent-child relationship exception to termination of parental rights. No father is a party to the appeals. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Andrew C. was born in 2015. The family came to the attention of the Los Angeles County Department of Children and Family Services (Department) on August 11, 2020, when a reporting party disclosed to the hotline that Andrew was missing his two front teeth and had red marks on his forehead that "look like a rash or scratches." The referral also alleged Mother and stepfather[2] engaged in domestic violence while Andrew was present in the home. On August 26, 2020, the initial petition was filed. The Department assessed Andrew at "**VERY HIGH** risk" for future abuse or neglect in Mother's care because 1) domestic violence with Father in Andrew's presence caused him to be scared and traumatized; 2) Mother had a criminal history of spousal abuse and failure to prevent domestic violence; 3) Mother

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

[2]     For convenience in this opinion, we will refer to Mother's male live-in companion as Father. The juvenile court allowed counsel to appear for Mother's companion, then deferred paternity issues, then found her companion to be presumed, and later made a finding that he "is not any kind of father to this child and is not a party to this case."

2

failed to reunify with her two older children; 4) Mother traumatized Andrew by telling him that if he spoke to the investigating social worker, he would be taken to "kiddie jail"; 5) Mother's older two children were previously detained due to their mother's violent and impulsive behaviors and they cut their visits shorts because they were constantly engaged in arguing with their mother; 6) Mother had a total of 43 referrals since her oldest child was born and a total of four open dependency court cases, failing to reunified with her two older children; and 7) the juvenile court had terminated jurisdiction only six months previous in another open case involving Andrew, which alleged physical abuse by Mother.

At the detention hearing on August 31, 2020, the juvenile court detained Andrew from Mother and he was placed in shelter care with licensed foster mother M.R. Mother was permitted three monitored visits per week for three hours at a time; she was referred to a psychiatrist for medication management.

The Department prepared a Jurisdiction/Disposition Report dated October 21, 2020. Both Mother and Father denied the domestic violence incident of August 9, 2020. Andrew repeated several times, "Please don't take me to kiddie jail." He confirmed he had seen Mother hit Father with a fist. He stated he saw Mother punch Father in the eye and he stated: "Yes! That is why I am here forever! I want to go back home. I didn't want my mom to hit [Father] because I didn't want him to die! I didn't want my mom to die either! Now I can't go back home with my mom because she hit him!" Mother took the position that her son "might be confusing things" because she and Father "horse play and wrestle a lot." Both of Mother's adult children denied witnessing domestic violence in Mother's home; both denied that

3

Mother abused drugs. For Mother, the Department recommended family reunification services, individual counseling, a psychological evaluation, a mental health outpatient program, and psychiatric medication as prescribed.

On October 27, 2020, the Department filed a first amended section 300 petition alleging that Mother and Father had a history of engaging in violent altercations while Andrew was present; on August 9, 2020, Mother punched Father with her fist causing a black eye; Mother had a history of explosive behaviors and verbal altercations; Andrew's siblings received placement services due to Mother's history of domestic violence; and Father failed to protect Andrew from Mother in the family home. It was also alleged Mother has mental and emotional problems which render her unable to provide regular care for Andrew. She failed to obtain consistent mental health services for her psychiatric condition and failed to take psychotropic medication as prescribed. Finally, it was alleged Father's history of alcohol and substance abuse endangered Adrew's physical health and safety.

At the adjudication and disposition hearing on December 16, 2020, the juvenile court sustained the domestic violence and failure to protect counts and dismissed the rest. Andrew was declared a dependent of the court and removed from parental custody. The court ordered reunification services for Mother including a 52-week domestic violence program for perpetrators, a parenting program, mental health counseling, a psychological evaluation under Evidence Code section 730, and individual counseling. Monitored visitation was left in effect.

At the six-month status review hearing on August 26, 2021, the court found both parents had made substantial progress with

4

their case plans, ordered unmonitored day visits for them, and continued family reunification services.

At the 12-month status hearing on November 2, 2021, the court found Mother had made substantial progress with her case plan and continued family reunification services. At an interim hearing on January 3, 2022, the court again found the parents' progress to be substantial, issued a home-of-parents order, and converted services from family reunification to family maintenance.

By report dated April 15, 2022, the Department advised the court that a new incident of domestic violence had occurred on March 30, 2022. Mother and Father engaged in a "short wrestling match" and he punched her on her face during their argument. Andrew was at home but did not witness the event. As a result of the incident, the Department was reconsidering its planned recommendation that jurisdiction be terminated. On May 4, 2022, the Department filed a section 342 petition alleging that in March 2022, Father hit Mother's face with his fist and lacerated her nose; she, in turn, punched him and they pushed one another. Father was arrested for spousal assault; Andrew was told not to share what went on in the home. The petition concluded that the parents' violent conduct and Mother's failure to protect Andrew placed him at risk of harm. The Department recommended that Andrew be again detained from Mother and Father.

On May 6, 2022, the juvenile court heard Mother's testimony about the new domestic violence allegation, temporarily detained Andrew on the new petition and ordered monitored, separate visitation for Mother and Father. On June 17, 2022, the juvenile court sustained the 342 petition as pled.

On June 23, 2022, the court issued a temporary restraining order protecting Mother from Father.  On July 14, 2022, the juvenile court detained Andrew from the parents, found the parents' progress with the case plan "unsubstantial," terminated family reunification services, and set a section 366.26 permanency planning hearing for November 10, 2022.

On November 9, 2022, Mother filed a section 388 modification request seeking Andrew's return or, in the alternative, reinstatement of family reunification and unmonitored visitation.  The court set it for hearing on December 12, 2022.

By now two years had passed since proceedings commenced.  The Department recommended that the petition be denied as "granting [Mother's] 388 petition could jeopardize the child's current permanent placement or any further placements as a result of [Mother's] behaviors and actions. [¶] Despite [Mother's] participation in services, it appears that [Mother] has not completely mitigated the concerns which led to the child's multiple detentions from her care."  On December 12, 2022, the juvenile court summarily denied Mother's section 388 petition.

Mother was present at the section 366.26 permanency planning hearing on January 12, 2023.  The juvenile court identified adoption as Andrew's permanent plan and continued the selection and implementation hearing to July 2023 as the Department was actively looking for a new placement.

From December 29, 2022 through March 23, 2023, Andrew was in a fourth placement with Ms. Reynoso and Ms. Casselman. On March 23, 2023, Andrew was placed in the home of Mr. E., where Andrew reported he was happy.  In July, the Department

requested a continuance of the permanency planning hearing for 60 days as it worked to facilitate Andrew's adoption by Mr. E.

On July 13, 2023, Mother filed another section 388 modification request seeking reinstatement of family reunification services and Andrew's return to her; alternatively she requested unmonitored overnight visitation. On August 17, 2023, the court denied the request without a hearing, finding "the circumstances here have not changed and that it is not—and, more importantly, that it's not in the child's best interest to not only grant this [section] 388 [request], but to even set a hearing for it. So, at this time, I am going to deny the request to set a hearing and I am going to deny the [section] 388 [request] outright as well."

On October 17, 2023, the court held a selection and implementation hearing. Mother objected to the termination of parental rights on the ground that the parent-child bond exception applied. The Department noted that Andrew had indicated he wanted to be adopted. The court found by clear and convincing evidence that Andrew was adoptable, no legal impediments to adoption existed, and the parental bond exception under section 366.26, subdivision (c)(1)(B)(i) did not apply. The court stated: "Although [Mother] has visited with the child, I think there's been a lot of inconsistencies in those visits. . . . [Mother's] visits have been reduced over time. Mother's missed some visits. The calls have been somewhat short recently, and so I would say that the—the relationship with the child is not beneficial . . . . [¶] I also note the prior behavior that led to the—led to the other legal guardianship . . . falling through . . . and the issues with [M]other being aggressive with caregivers, switching times and locations of visits, leaving early,

7

disrupting the child's mealtime, bedtime, et cetera, and doing things like telling the child that he would be going home to her, that the foster parents are destroying the child's life, these things have caused the child a lot of anxiety over—over the period of time. The fact that the child has had to have so many different placements has clearly been detrimental to the child. And so I don't believe given all of that, . . . [M]other has a beneficial relationship with the child and therefore terminating the . . . parent-child relationship would not be detrimental to the child." The court then terminated Mother's parental rights to Andrew.

These appeals followed.

## DISCUSSION

### *The Juvenile Court Did Not Err in Finding Inapplicable the Beneficial Parental Child Relationship Exception to Adoption.*

I.     Applicable Law

At a section 366.26 permanency planning hearing, the court determines by clear and convincing evidence whether the child is likely to be adopted. If the child is likely to be adopted, which is undisputed here, adoption is the preferred permanent plan of the Legislature. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573.) Once the court finds that the child is likely to be adopted, the court is statutorily required to terminate parental rights unless there is a compelling reason to find that termination of parental rights would be detrimental under one of the six exceptions enumerated in section 366.26, subdivision (c)(1)(B). (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206–207). One of the exceptions is the beneficial parent child

relationship exception in section 366.26, subdivision (c)(1)(B)(i). (*In re Caden C.* (2021) 11 Cal.5th 614, 629 (*Caden C.*).)

Three elements must be satisfied to establish the beneficial parent child relationship exception: 1) regular visitation and contact, taking into account the extent of visitation permitted; 2) a substantial, positive, emotional attachment to the parent— the kind of attachment implying that the child would benefit from continuing the relationship; and 3) a showing that terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home.  (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  When the parent has met that burden, the parent child relationship exception applies such that it would not be in the best interest of the child to terminate parental rights.  In that case the court must select a permanent plan other than adoption.  (*Id*. at pp. 636–637.)

The parent has the burden to show the statutory exception applies.  (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.)  When a party with the burden of proof does not carry that burden, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.]  Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved of on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)  Whether the trial court correctly interpreted the law is a legal issue of statutory

interpretation reviewed de novo. (*In re R.T.* (2017) 3 Cal.5th 622, 627.)

Because the court concluded Mother failed to prove the exception, we determine on appeal whether the evidence compels a finding in her favor as a matter of law. (*In re I.W.*, *supra*, 180 Cal.App.4th at p. 1528.) Mother has failed to show that the evidence, taken as a whole, compels a finding in his favor.

II.    Standard of Review

The substantial evidence standard of review applies to the first two elements of regular visitation and a substantial positive emotional attachment of the child to the parent. The third element, whether termination of parental rights would be detrimental to the child because of the child's relationship with the parent, is reviewed under the abuse of discretion standard of review. (*Caden, supra*, 11 Cal.5th at pp. 639–641.) Abuse of discretion is defined as an order that is "arbitrary, capricious or patently absurd" which no court " ' " 'could reasonably have made.' " ' " (*In re N.M.* (2011) 197 Cal.App.4th 159, 171; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

III.   No Detriment to the Child

We proceed directly to the third factor as it was expressly cited by the juvenile court in denying the parent child relationship exception to adoption. "What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden, supra*, 11 Cal.5th at p. 633.)

Up until the March 31, 2022, domestic violence incident that prompted the section 342 petition, both parents appeared to

10

be in compliance with their case plans. However, Andrew's kindergarten teacher had observed that Andrew was not the happy, energetic, and social child he was when he was out of home care. She observed that since Andrew had been reunified with his parents, he was "withdrawn, sullen and has reported [Andrew] does not feel comfortable telling them if something is going wrong at home because '[his parents]' told him not to. . . . The child said that he was sad because his daddy went to jail for fighting with mommy." Based on the report of domestic violence (which both parents denied), the department assessed there was not "sufficient changed behavior that enable the parents to keep the child Andrew safe." Mother disclosed to the Department that "she did not intend to continue to work with the Department honestly regarding ongoing domestic violence for fear of the consequences to herself, failing to acknowledge the potential safety ramifications to the child Andrew." The juvenile court again detained Andrew from Mother as a result of that incident and placed him back in foster care.

At that point, things further degenerated. In a report dated on October 26, 2022 for a hearing on November 10, 2022, the Department pointed out that Andrew had been detained and placed in foster care from November 13, 2017 until July 26, 2019 on the first case opened on his behalf. He was detained again on August 24, 2020 until January 3, 2022 when he was reunited briefly with Mother. On May 2, 2022, he was detained a third time in the foster home of Mr. and Mrs. M. The Department noted Andrew's current foster parents/prospective legal guardians, Mr. and Mrs. M., reported Mother threatened them should they adopt or take legal guardianship of Andrew and said "it would be the end of her world." As a result they withdrew

11

from offering Andrew permanency. The foster parents indicated Mother called Andrew "every day at all hours whenever she wants to, and is disruptive of meal times, bed times, etc. Additionally, on the phone and at the in-person visits, the child, Andrew becomes very upset when [Mother] tells him he is coming home to her, and that the foster parents an DCFS are destroying his life." Mother would show up and hour or two late and leave one to three hours early for Saturday visits scheduled for nine hours. She would also change the time and location of the visits. The foster parents accommodated Mother's request because she became aggressive with them. Mr. and Mrs. M. said Andrew was very anxious, misbehaving after visits and telephone calls with Mother. As a result of Mother's threatening behavior and despite the bond they felt with Andrew, they withdrew their offer to provide Andrew with permanency. To salvage the placement, the Department implemented protective measures to address these issues including spacing visits two times a week for one to two hours in duration. Monitored telephone calls were three times a week at a certain hour for 15 minutes only. The monitor had the authority to terminate the telephone call if Mother discussed the case or was inappropriate.

Two months later, in a report dated December 21, 2022 for a hearing on January 12, 2023, the Department again advised the court that Mother "engages in threats, belligerence, and intimidation in an effort to manipulate the child and caregiver." During visits, Mother "frequently spoke to the child about the case, and spoke to the caregiver in the presence of the child, threatening to kill herself if the caregiver offered any form of permanency to the child. [Mother] was frequently belligerent, hostile, and manipulative of the child and the caregivers to

compel them to do as she desired." Mother's therapist reported that Mother demonstrated a lack of insight as she continued to threaten and intimidate others to manipulate them into doing as she wants them to do. Mother "does not demonstrate the ability to place the needs of the child ahead of her own." The Department concluded Mother "deliberately sabotaged the placement and permanency plan for the child" and recommended the visits be reduced to once per month and telephone calls to once a week. The Department was actively seeking a new foster placement and commented that the seven year old has been in and out of foster placement since he was two years old.

Six months later, in a report dated June 23, 2023 for a July 13, 2023 hearing, the Department reported that, in March, Andrew had been placed with Mr. E. in another home (his fifth). Mr. E. had enrolled Andrew in extracurricular activities and went out of his way to ensure Andrew improved academically. He also had a strong bond with the child. Mother had monthly monitored visits and weekly telephone calls without incident. Andrew reported he "has been happy living in the home" with Mr. E.

In August 2023, the Department advised the court that Andrew was still placed with Mr. E. The Department reminded the court that Andrew had already been detained twice after reunifying with his mother, despite the services she had participated in over the years. It recommended that the court allow Andrew to pursue permanency through adoption because it did not believe Mother would be able to provide a stable home for him.

Mr. E. also weighed in about Andrew's contact with Mother. He reported that Andrew was bothered by the telephone

13

calls with Mother and did not want to talk to her, but Mother would bribe him, beg for his attention and question him about why he did not want to talk to her. Mr. E. said Andrew wanted the calls to just be over but felt guilty about wanting to hang up after the promises Mother typically made to him. Mr. E. was worried that more time with mother would be psychologically damaging to Andrew who needed "a supportive parent willing to give it all for him" and who knew "the difference between bribing and gifting from the heart." Andrew was "becoming strong, social, outgoing and smart." Mr. E. reported "smart" was new to Andrew's vocabulary and said the child previously thought he was a failure.

The Department filed a report on September 15, 2023 in advance of the selection and implementation hearing. It advised the court that Mr. E. remained committed to adopting Andrew and Andrew wanted Mr. E. to adopt him. Mr. E reported Andrew "does not look forward to talking on the phone with [Mother] during weekly calls. After visits, the child appears 'normal' with no indication of emotional distress." He said the boy "appears excited for the things [Mother] buys him and after 5 minutes loses interest." Mother reported her telephone calls with Andrew were brief because he did not want to talk to her. She reported that buying things for Andrew was how she expressed her love for him.

The Department concluded that since Mother's visits had been limited to one a month in person and once a week by telephone, Andrew appeared to be responding positively in placement. Andrew had been in five different placement during his time in foster care and it believed Mr. E. was the most appropriate adoptive permanent plan for him. Mother was

14

adamantly opposed to adoption and reported her older children were abused in foster care, although she was "okay" with Mr. E.

The Department made clear in its reports that Mother and Andrew had a bond and connection with each other, but given Andrew's need and desire for permanency, it concluded the benefits of permanency through adoption clearly outweighed the attachment Andrew had with Mother to the extent that adoption would not be detrimental to him. This was also the recommendation of Andrew's counsel.

We agree with the juvenile court that the parent child relationship exception does not apply here. Andrew had been in five different foster placements in the eight years since his birth, in no small part because of Mother's relentless interference with the caregivers. He had no difficulty separating from Mother after their monthly visits. Nor did he relish their telephone calls. The record does not reflect any particular affection Andrew had for Mother, other than because of the gifts she brought him when she visited. Indeed, the record is devoid of any benefits he enjoyed by virtue of his bond with Mother. He took Mother's telephone calls out of guilt, despite not enjoying his conversations with her. His behavior stabilized when his contact with Mother was reduced. His self-image, performance in school, and social life improved as his interactions with Mother waned. And his desire to be adopted by Mr. E., despite his bond with Mother, evidenced, at the very least, a preference for stability with a caregiver he bonded with over the roller coaster ride that was his life with Mother. The court's conclusion that the benefits of permanency through adoption by Mr. E. outweighed the possible disadvantages of terminating the parent-child relationship with Mother was not an abuse of discretion.

## DISPOSITION

The order terminating parental rights is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

                                    STRATTON, P. J.

We concur:

GRIMES, J.

WILEY, J.